The merger at issue here stands to reshape the entire gaming industry by giving Microsoft the chance to dominate it for years to come. And yet, the district court waved it through with little scrutiny, principally by misapplying Section 13B of the FTC Act, which this court in Warner Communications held entitles the FTC to a PI if it shows serious questions as to the antitrust merits. The district court misapplied that in multiple ways, the most obvious of which, probably, is that it relied on the defendant's proposed remedies and some purported efficiencies to deny relief when the remedies and the efficiencies, in fact, do not belong at all in a Section 13B proceeding. And that is because this proceeding is meant to be preliminary. It's supposed to be very narrow in scope. It's supposed to give readily available relief to the government. And most importantly, it is not going to ascertain the nature or the scope or the quantum of the harm. So if you don't know what the harm is, how can you say that these proposed remedies or this purported efficiency would fix that harm? That is at the core of the district court's decision, and that is the biggest problem we have with the decision below. The court also had other— You're claiming that that establishes a legal error? Absolutely, Your Honor. With respect to which part of the analysis and with respect to which of the markets? Right. With respect to two markets. In the cloud market, the district court did not engage in any— Because we've gotten some submissions on what has happened with the U.K. Right. Does that have any effect at this point on our review with respect to the cloud market? None whatsoever, Your Honor. That case is about a different geographic market. It's the U.K. market. Whatever was agreed between Microsoft and the U.K. Competition Authority is not enforceable in the United States, not enforceable by the U.S. government. Does that have any effect on how the markets and behavior in the United States will play out? We don't know that. In fact, one of the biggest problems with what Microsoft suggested to the district court below is that if you were to propose a remedy and say that this will fix the problem, you should at least show how do these contracts affect the market. Microsoft had the burden to do that, and they did not. So on the cloud market, the district court did not engage in any analysis. It simply said that the government's likelihood of success case is preempted by these contracts. In the second market, which is the subscription market, the district court accepted that, in fact, there will be foreclosure, that Activision's content will be available on only Microsoft platform, and the other platforms would be denied. But still concluded that the fact that Microsoft platform would allow access to consumers that did not exist now makes it a pro-competitive merger. That's wrong for two reasons. One, efficiencies, as this court said in San Alfonso, is supposed to go to competition. Better service is not enough. Is there any case that specifically analyzes this issue over the role of efficiencies in the context of a vertical merger? The best I can think of, Your Honor, is the DuPont case, the second DuPont case from 1961. But that's not the only – if that was the only issue – I mean, it comes up – it came up in the AT&T case. The district court mentioned the issue of efficiencies, but the D.C. Circuit didn't use the word efficiency but did look at pro-competitive aspects of the transaction. Absolutely. Which sounds like you would claim it's efficiency, but that would suggest the one circuit precedent that looks at this issue points in the other direction. No, Your Honor. AT&T was not a 13B PI action. We are not claiming that efficiencies and even proposed remedies have no role to play at all when we get to the merits. We're talking about only the 13B proceeding. So AT&T is completely the opposite. We are not claiming that efficiencies do not have a role to play. So you think that 13B makes the – what are the substantive standards ultimately on the merits irrelevant? No, no, no. We're not saying that the standard on the merits is irrelevant. It's not at all. What we're saying is at this stage of the analysis, when you don't know the extent of the harm, you won't be able to tell whether this efficiency is going to be enough or not. This court in San Alfonso laid out the four conditions that typically a court has to go through to analyze an efficiency. The first being whether it's cognizable, meaning it has to go to competition. It has to increase competition, not simply customer service. The second, it has to be verifiable. It has to be merger specific. And the last one, which is critical in this context, is it has to show the efficiency. The district court didn't – I mean, the point the district court made with respect to the subscription market is that Aptivision's content isn't going to get on the subscription market absent this merger. It wasn't – she made a factual finding. I understand you attacked it. She did not make it in the subscription market, Your Honor. That factual finding is also wrong, and I'm happy to talk about it. But that finding was made in the counsel market. In the subscription market, the district court accepted that Aptivision's content will be available only on Microsoft Game Pass and will not be available on rival platforms. It accepted that but found that the increased access to that content by consumers would be pro-competitive. That itself is also wrong as a matter of law because the comparison is wrong. The right comparison is not the market before the merger versus the market after the merger. The comparison is the future with and without the merger. And so the right question the court should have asked is, is the consumer's access to Aptivision's content on Microsoft platform, what would that do in the future? And it itself accepted it means Microsoft will be a monopoly in that market. Those gamers will not be able to access those games on any other platform. So that's why that market is also wrong. The factual finding that you referred to that made that there would be no likelihood of or rather no incentive to foreclose was made only in the counsel market, and it itself is built on multiple legal errors. It first said that Microsoft incentive to foreclose can be negated by the testimony of Microsoft executives that do not intend to do that. But intent, a subjective matter, does not negate economic incentives to foreclose. I want to go back to what you said about her order in the library subscription services market. Yes. Because, you know, she does say that she accepts for preliminary injunction purposes it is likely the call of duty will be offered exclusively on Game Pass. Right. The countervailing incentives that exist in the counsel market. Sorry, you're right. And not offered on rival subscription services. Correct. Right. Okay. And the countervailing incentives that exist in the counsel market do not apply in the subscriptions market since call of duty is not and never has been offered in any significant sense on a multi-game library subscription service. And then goes on in light of that to say the merger has the pro-competitive effect of expanding access to call of duty because it will make it available in the subscription market where she found that it would not be made available. That's why I'm saying, Your Honor, that's what's wrong. Because what the district court did is it compared the pre-merger world where call of duty and I have to remind the court this case is about a lot more than just call of duty. But let's take call of duty as an example. The district court said call of duty is not available now on subscription services, but it will be on Microsoft service with the merger. San Alfonso says this is not efficiency. This is not enough to have better customer service, which is what this is. Efficiencies are supposed to increase competition. So how does giving Microsoft monopoly over Activision's content increases competition in the future? The question is about the future. That's what the Clayton Act is all about. In the future, what we submitted as evidence was that Activision was, in fact, willing to put its content on multiple subscription services. The reason it did not to that point was nobody met its commercial terms. But there was nothing to prevent it from putting it on both Microsoft and rival subscription services. That's one of the basic errors. That's a legal error, and that is, in fact, harmful going forward for merger review is to deny preliminary relief on the basis of a purported efficiency, which no court has ever done before. I just want to make sure I understand one aspect of your argument. Is your contention that the district court erred by treating the increased access to Activision games, including Call of Duty, by making them available through subscription streaming services, not actually a pro-competitive effect? Because it might be increasing consumer access to that thing, but it's not actually increasing competition. Correct. That's exactly right, Your Honor. The first condition of efficiency is that they be cognizable, that efficiency goes to increasing competition. Again, I refer you back to this court's decision in San Alfonso, where it said simply having better customer service is not efficiency. But this is an equivalent to better customer service in a horizontal merger. I mean, she went on on the next page to say the FTC's primary argument appears to be that even without the merger, Activision will put its content, including Call of Duty, on subscription services. The record evidence is to the contrary. So she makes a finding that that's not likely to happen. And with all due respect, Your Honor, first, we disagree. I understand you disagree with that, but that's a clear error review as to whether or not she read that record evidence correctly and made that finding with respect to the likely conduct of Activision in the absence of the merger. Yeah, let me give you a two-part answer, if I may. First, I'm not sure how you can reconcile that with her clear statement that she accepts that Microsoft's platform would be the only platform. Those propositions are not inconsistent. What she was saying is that if the merger doesn't go forward, Activision isn't going to play along with the subscription market. It doesn't work out for them. Even if that's the case. Don't interrupt me. I'm sorry. I apologize. I'm setting up the computer. Yeah, yeah, yeah. Okay. That Activision wasn't going to do that. Okay. Having the merger, yes, Microsoft's going to make the content exclusive, but it gets the content into the subscription market. That's pro-competitive because it adds something else into that market that presently will be, in a sense, foreclosed from that market. That's why she viewed that as pro-competitive. That's not like saying if I become a really big monopoly company, I'll deliver better service. That's not on the same level as that. Fair enough, Ron. Let me answer it this way. Even if you accept that this increased access to Activision's content is recognizable as an efficiency, that's only one of four conditions that Microsoft had to satisfy. It didn't satisfy any of them. Even on your view and the district court's view, even though there is contrary evidence in the record that Activision was willing to put its content on subscription services, but even if you take that as, in your words, a clear error issue, so you accept Activision is not likely to put its content on rival subscription services, we still don't know what that does to the market in terms of whether that would be enough to, in fact, negate the harm because we're allowing Microsoft to be a monopolist in that market. How is that pro-competitive? I fail to understand how giving somebody a monopoly of something would be pro-competitive. It may be a benefit to some consumers, to a class of consumers, but that is very different than saying it is pro-competitive. That's in the subscription market. Even if you go back to the console market, again, the district court's finding that Microsoft does not have the incentive to foreclose rivals is built on testimony by Microsoft executives about their intent, whether they will do it or not. And we showed that in just the recent example of the ZeniMax acquisition, they, in fact, foreclosed everybody else from that content. So the facts are wrong. The economic basis for that finding is wrong because you cannot negate objective economic incentives with subjective intent. Antitrust is built on a very core presumption that corporations are always seeking to maximize their profits. If something is profitable, they will do it. That's the assumption. And we showed below that foreclosing rivals from Activision's content, in fact, will be profitable for Microsoft. So getting some executives to say, no, but we do not plan to do it, it simply does apples and oranges. It does not negate them. It seems like what you're saying then is so long as I can show that something is profitable, I've met my burden. I don't actually have to show how this business functions or the culture of that business or whatever decisions I might make. I just, I can benefit from the presumption of a business that's going to chase anything profitable. So as the FTC, all I have to show is this is profitable. That's not quite right, Your Honor. But we've showed, to me, the likelihood of success burden. We suggested from the very first part of our case, right, in the TRO memo, there are two ways to approach this case. One of them, which some courts have used, is called the ability and incentive to foreclose. If you show a company has the ability to foreclose and has the incentives to foreclose, then you've met your likelihood of success burden. The other way you can do it is to follow the Supreme Court's analytical framework in Brown-Hsu, which looks not so much at the particular merged parties incentives, but looks more holistically at the market in general and the structure of the market. So it looks at what size of the market will be foreclosed, whether there are high barriers to entry, whether there's a trend towards consolidation in the market. We showed all of that. So it is not just that we showed that it is profitable. We also showed that in the past, that's what Microsoft did. I want to make sure I understand your view of the analytical framework. So we set Brown-Hsu aside. Okay. And we just talked about the other, the ability and incentive standard. Under that standard, if that's all we're thinking about, I go back to my question. Do you think that all your burden is is to say there's a presumption that a business will chase profit? I show profit. I've made my burden. I see my time is running out, but I'd like to answer your question if I may, please. The answer is yes. That's what the law requires to show likelihood of success. If you show that the merged party will have the ability to foreclose its rivals and you show that it will have the incentives to do that, then you have met your burden. So I understood from the briefing that that's sort of how this case started, that it was an and, you must show both ability and incentive? Correct. And then in the briefing it suggests that maybe you don't have to show both, just one. No, no, Your Honor, but that may be because the district court already accepted that Microsoft, via its control of Activision, will have the ability to foreclose. So just to be clear, because I had some confusion about this, maybe my colleagues do as well, but you're here today to say that under that standard, you agree that the burden is both ability and incentive, not just one or the other. Yes, it's both. But the district court already found that Microsoft will have the ability because it will control Activision, so it can decide who gets it and who doesn't. And the question of whether Microsoft has the incentive, that's a factual finding that the district court made that there was not incentive to foreclose. Correct. It made it in one market, but not in the other two. In the console market. Correct. So I assume we're reviewing now that finding, that at least on the preliminary injunction record, that there was not incentive to foreclose in the console market. We're reviewing that for clear error? You would review it for clear error, but factual findings that are built on the wrong legal standard or the wrong economic theory is, in fact, clearly erroneous. Well, I understand your argument is that essentially she required too much certainty. Right? So your view is that if there was a serious question about whether there was an incentive, then that should have been a basis. But what if she found, as a factual matter, based on the evidence, there was no serious question as to whether Microsoft had an incentive? What would be the clear error in that factual finding? The clear error would be that that finding was based on testimony about intent, rather than incentive. It is also based on trying to find it, Your Honor. There were a couple of errors that the district court did there. One is the intent versus incentive. Two is that it also misconstrued the standard of 13B as this court in Warner Communications said. So, for example, let's say on the issue of whether Microsoft past conduct points one way or the other. So we put in evidence that in the most recent big acquisition it did of ZeniMax, Microsoft foreclosed its rivals. So the past conduct points this way. Microsoft pointed to an acquisition from 10 years before of one game that, in fact, has special characteristics called Minecraft that it did not foreclose. The district court in that case simply took one side over the other. That's not what the court is supposed to do in 13B. That's not what Warner Communications said. The best way I can perhaps explain it is if you can imagine the FTC opposing a motion for summary judgment below, if the FTC can show there are genuine issues of facts that are key to the decision, then relief should be granted. That's what this court meant when it said the district court is not supposed to resolve factual disputes in a 13B proceeding. That also is a legal error underlying that factual finding. And so I understand you to be saying it was legal error for the district court to consider evidence regarding Microsoft's subjective intent. Yes. And what is your best case for that? Well, I guess first common sense, which is backed up by even the Supreme Court in the Indiana Federation of Dentists case, said the FTC is fully entitled to rely on economic theory and common sense. The Warner Communications case says that – sorry, there are a number of cases that point to intent being not part of the analysis. Right, so we have cases that say we should not – it was error to consider subjective intent. So we have Chicago Board of Trade, Aspen Scheming, the D.C. Circuit Microsoft decision. Cal Dental from this court said motives will not validate on otherwise any competitive practice. From the 8th Circuit in Mississippi River, it said honest intentions, business purposes, economic benefits are not a defense to our violation of the antitrust laws. So that is not really a – it's not a controversial point. It's just the district court did not apply it rightly. All right. We've taken you over your time. Yes, thank you. But I'm going to give you, because we've had a lot of questions, your five minutes for rebuttal. I appreciate it. And we'll hear now again from Mr. Clark. Thank you again, Your Honors. At least below, the FTC's case was built on the idea that a single game made by a single company is the key to competition in the dynamic gaming industry. In evaluating that claim, the district court heard testimony from 16 different witnesses, as well as any testimony the FTC wanted to enter from the more than 50 depositions that were taken in this case. The court also considered every document the FTC submitted from the millions it received over its 18-month review of the merger. But after reviewing all that evidence, the court correctly concluded that the agency had failed to show a likelihood of success on the core theory that the FTC actually presented at trial, that Microsoft would foreclose rivals from Activision content. I'd like to start, if I could, by addressing the questions and the claims that were made about the subscription and the cloud markets and what the court found and didn't find. Can I ask you to start first with the cloud market and your response to his view that what happened with the conditions imposed by the UK don't have any relevance to our review? We disagree with that, Your Honor. First of all, it's not true that that has no effect in the United States. As we pointed out in our 28-J letter, what happened is that Activision divested the cloud rights before Microsoft purchased it. So Microsoft does not own cloud rights except as necessary through a license to continue the deals that it already agreed to. So the FTC says in their brief that divestiture is the favored remedy. We have a divestiture. Going back, though... So effectively, the merger is not going to have an effect on the U.S. cloud market. That's correct. It will only be pro-competitive and that the deals that Microsoft entered into remain enforceable. But beyond that, another company owns the rights to cloud. Microsoft doesn't. So it can't foreclose anyone from anything. Now, we do think that it was proper to consider those agreements, and I'll explain why in a minute, but I just want to address the points that were made earlier about what exactly the district court made as a factual finding. Counsel said that all the district court did is look at the world as it exists today. That is not accurate. In the subscription market, and I would direct you to page 49 of the record, Judge Corley found that the FTC's primary... This goes beyond what you raised, Judge Collins, but I just want to point it out as well. The FTC's primary argument appears to be that even without the merger, Activision will contract to put its content, including Call of Duty, on subscription services. So she was explicitly talking about the future without the merger. And what she said as a factual finding is that the record evidence is to the contrary. And if you look at what she cites, it is overwhelming on that score. There was testimony from the CEO of Activision, not just that he hadn't thought it was a good idea in the past. What's the legal standard that applies here? Because one of the FTC's main arguments is that in reviewing this issue, the district court applied the wrong legal standard because it was incorporating this idea of what he terms as efficiencies. And the efficiencies defense in the horizontal context has been rejected by some courts. And he's saying that essentially that kind of an error infected these proceedings. What case tells us how to analyze the issue of claimed benefits or efficiencies in the vertical context? So I just want to be clear, Your Honor, this is not an efficiencies defense. This is an argument about the world with and without the merger. And the cases that show that that's the right... I mean, that world with or without the merger is temporal. It's a temporal look at how competition is being affected. So you have to analyze the competitive effect. And so what's the role of what he's calling derisively efficiencies in that analysis and what legal standard tells us what to do with that? It's not answered by saying temporal. Sure. So I think the legal answer is to look at AT&T and also the recent change healthcare decision by the D.C. District Court. Those are Section 7 cases. And yes, they're not 13B cases. But nothing about the 13B context changes the substantive law that applies. It's Section 7 no matter what. And in those cases, the court in the vertical context says you have to show two things. One thing which the FTC can't address and is a factual finding I mentioned earlier is that without the merger, the world will be more competitive. That's a factual finding that the court made. She said there's no evidence that these gains from Activision are going to go on to subscription or cloud. And that matters because the theory is a foreclosure theory that the FTC presented, and it makes no sense to say you are being foreclosed from something you were never going to get in the first place. I understand the argument a little bit differently. I understand at least the part that I'm concerned about, to be honest, is that assuming without the merger, there would not be access to Activision's games in the subscription gaming market, that even assuming with the merger, there would be access to Activision games and at least Microsoft's subscription gaming service, that that's not actually pro-competitive. That might benefit some consumers, but you can't equate a benefit to some consumers to a pro-competitive effect in that there could still be a negative effect on essentially the competing subscription services. And that's really what you have to look at in that improving access to Activision's games for some consumers would actually have a negative effect on the competitors in that market and that district court legally erred by essentially treating the increased access as a pro-competitive effect. I don't think that's a legal error, and I also don't think that that's the theory the FTC presented. So first of all, the theory that I believe Your Honor is talking about is not a foreclosure theory. It's a theory about a trend monopoly in these markets, that subscription and cloud will become less competitive in the future. The FTC did not present evidence and argument on that theory, and the clearest evidence of it is if you look at footnote 15 of page 20 of their reply. They were asked, but we raised this issue, they didn't present this argument about a trend monopoly in subscription and cloud. And what does the FTC cite in response? They don't cite record evidence. They don't cite testimony from the court. They say that they presented a Clayton Act claim below, and they cited section 7, which is proof that they presented some kind of monopoly theory. That's not record evidence. The district court was not presented with. The FTC did not argue below. They argue now on appeal. It starts their brief. But they did not present below the claim that there would be some kind of trend to monopoly in the subscription and cloud markets. It's just not the theory they tried. They were forfeiture argument, but then on the merits. So then on the merits, the theory they actually tried is a foreclosure theory, and that theory involves looking at what the world be with and without the merger. So I understand. Can you address on the merits of the argument that you're saying? I understand that you're arguing we shouldn't even reach it because they didn't argue it below. Putting that aside, can you address the merits? Sure. I think under that claim, the argument is that the world without the merger is better than the world with the merger. That would be the claim. And the district court found as to what the world will look like without the merger, these games won't go on subscription and cloud. She then found with the merger, they will go on subscription and cloud. And I would just note, you don't just have to take our word for it. The FTC's expert was cross-examined about this by my colleague, Ms. Wilkinson. Jed Sung's question is more focused on the effect on competition in the market. So now you're going to get all this premium AAA content, high-quality games. You can put them on your subscription. You will foreclose. You'll do it for $10 a month. And as the email Mr. Aliotto pointed out, you'll just drive Sony out over the long run because they won't be able – Sony isn't going to be able to have a subscription service at $10 a month with that kind of quality. That kind of long-term concern towards monopoly in the subscription market seems to be a serious issue presented on these facts. I understand you claim that it's waived, but can you address that concern? Even separate from the waiver argument or the forfeiture argument, it's not presented on the facts. There isn't evidence in the record that that state of affairs will harm competition. Dr. Lee, their expert, didn't say the world will be more competitive, will be harmful tomorrow because these games will go on Game Pass, and the market will become less competitive in the future. How do we think about that in terms of dealing with a whole new market that nobody really knows how it's going to shape out? And isn't that where we're at? It may be, Your Honor, but I think the burden would be on the FTC to present economic evidence supporting a theory that in the future there will be harm to competition, not to consumers, competition in that market. And they didn't present that evidence both because they didn't show that this content would ever go on rival services and because the evidence, which the district court properly relied on, is that Microsoft wasn't going to actually take the content away from anyone else. So if I could go back to the earlier question, I think it was legally proper for the court to consider these agreements and the expansion of output in the future. And again, you can look to AT&T and you can look to change as proof of that. In AT&T, there was an arbitration offer that essentially said anyone who wants the content can get it. And the D.C. Circuit did not say that's an efficiencies defense. They said that that rebutted the government's model of economic harm because it was something the government hadn't accounted for, a real-world development that they had no answer for. In the recent change case, you saw the same thing. The court in that case found, in partly rejecting the government's foreclosure theory, that United had agreed as a private matter to firewalls  And the court said that, again, shows that there isn't going to be harm in the future in this market. I may be mixing things a little bit, but it's sort of digesting what your friend across the aisle's argument was. Perhaps the theory or the argument is, for the streaming, is Microsoft's going to get there first and it's going to get there big because it's got the best infrastructure for that. And then it's got every incentive to be the only player there. And so down the road, it's just going to make decisions to make sure that it's the biggest dog in that market forever. Why isn't that – I guess, what is your response to that? That they didn't raise that or that it's meritless or that it's speculation? I'm just trying to figure out, like, what is your sort of primary mode of attack against that reasoning? Respectfully, Your Honor, I'd say it's all of the above. They didn't raise the argument that this trend toward monopoly is a competitive concern. They presented a theory of foreclosure, which requires showing you would lose access to something you wouldn't have. They didn't make the showing on the facts because they did not show, and their expert would not testify under cross-examination, that it was likely that any of this content would go on subscription or cloud platforms in the but-for world without the merger. And that's at SER 158 to 159. So this kind of gets to the point I'm trying to make about – trying to figure out the argument on the other side and what to make of it. It may be an absolutist argument, right? Like, I don't need evidence because I can just say that every business has the incentive to make money, and Microsoft's going to make a whole lot of money if it's the only player in that space, and therefore I get the presumption, and I don't need an expert to actually give you facts and data about the market and how it's going to shape up. I think that may well be the argument, Your Honor, and respectfully, that cannot be right. It can't be right for a few reasons. First, no court has ever enjoined a vertical merger under Section 13b. So if they were right, the record of cases would look very different. AT&T would look different. Change would look different. Because in every case, vertical case, a company is acquiring an input, and one could argue as a theoretical matter that they have the incentive to withhold that from the rivals. But that's not the law. Even Brown-Schuh, which the FTC cites repeatedly, and I can talk about why they didn't actually present that theory below. But even Brown-Schuh says you need to show that the specific transaction at issue is going to cause some harm. That's at page 332 of the opinion. And they require proof of actual foreclosure of competition. That's at page 328 of the opinion. In the streaming services market, the district court basically said we do see a likelihood of foreclosure of Activision's games from the other streaming services. But said that making Activision available to customers was a pro-competitive effect. Assuming the argument is the benefit to essentially the customers of GameSoft is not enough to show essentially a pro-competitive effect to cut GameSoft's competitors versus its customers, then I think the argument would be that because we're talking about predictions of the future in a nascent market, there's only so much hard data we could present, but there's a serious enough problem here that we're entitled to the PI under the very lax standard. I think that's my understanding. Maybe it's not absolutist that we don't ever have to present, but here we have a problem with a nascent market, and we know enough. We know enough that Microsoft is dominating this early market. So I think a couple things. First, Your Honor, if you look at page 48 of the opinion, the court didn't say that there was foreclosure. The court just accepted that for preliminary injunction purposes. So I just think that's important to note. That's a sign that she was applying a lower standard than the kind of ultimate merit standard and kind of giving the FTC the benefit of the doubt on an issue. To the extent the theory was a nascent competition theory, I guess I would just say that it wasn't presented below. And just presenting that theoretical concern on appeal should not be enough to justify blocking a merger. You're primarily resting on the waiver argument, essentially, or failure to present it. I would say first, yes, waiver. And then if you look at the actual evidence in the record, there's no evidence since the district court's opinion occurred. There's actually evidence, which I won't repeat aloud, but we cite in our briefs because it's sealed, that Microsoft isn't foreclosing anyone, even from the subscription market. So I think that's further evidence that there's no incentive, ability, intent to foreclose in that market. But then the question is, we would just urge you to evaluate the claim that the FTC presented, which is that the world with the merger is going to be less competitive than the world without the merger. And that there were clear factual findings from the district court that the world will be better with the merger because in subscription, the game will go on a service that's never been on before. In cloud, it will go on multiple different platforms in addition to Microsoft's. But then separately, an independent factual finding, which is part of the foreclosure theory, they didn't prove that any of this content would go to any of these services otherwise. And it is not a violation of the antitrust laws to give consumers something new that's beneficial, unless they present some evidence of it, which they didn't do. What's your response to counsel's argument that Warner Communications stands to the proposition that the court shouldn't make factual findings and all he has to do is show a triable issue and then the FTC gets relief? We don't think that that's right, Your Honor. I'd say first, it's just a matter of first principles. We don't think the FTC should get a lower standard, but I think the district court clearly understood that a lower standard applied under Warner, and we think the evidence shows she correctly applied it in how she analyzed the evidence in the case. And I would say the clearest evidence of that is the number of important issues that the district judge actually resolved in the government's favor, even though there was conflicting evidence. And if I could just give a few examples, the first is at ER 28 and 29. And this is her conclusion for purposes of the opinion that Nintendo was not part of the console market. The court said, if I were the fact finder, I would find that Nintendo is in the market, but under the standard I'm applying, I will conclude that it's not. I think it's hard to overstate how significant that is. If you look at Whole Foods, if you look at Cisco, market definition is a key issue in all of these cases, in merger cases. And on that key issue, the judge concluded that Nintendo was not in the market, even though there was evidence the other way. There are other examples. So on the next page, ER 29, the judge found that subscription and cloud gaming are separate markets, even though there was considerable evidence in the record that that's not the case. If you look at ER 31, she found that subscription and cloud geographically as a market are limited to the United States, another example of a contested issue that she resolved for the FTC. This finding that we talked about earlier, this statement that there's going to be foreclosure of GamePass, that's just something that she accepted for purposes of preliminary injunction. She actually said, I accept it for PI purposes. That's at page 48 of the record. And then at page 34, she found ability based on the FTC's arguments. Again, that's another thing that was contested. So if the standard is lower, on a number of different issues, the district court gave the benefit of the doubt to the FTC. But I think it is also clear that the standard can't be as low as the FTC is suggesting, and it can't be kind of a mere scintilla of evidence or just coming into court for a number of reasons. First, the evidence that the FTC relies on to show a substantial question is their alleged economic evidence of the model, the Xenomax issue, which I'll address if time permits. That's the exact same evidence that they presented in their motion for a preliminary injunction. There's no difference in what they're saying raised a serious question after trial than before trial. So if they're right, why have a trial at all? Why have cross-examination? Why are the opinions in Cisco and in Whole Foods dozens if not hundreds of pages long? Why, in all of those cases, do the courts consider the conflicting evidence on both... I see my time is up. Why do the courts look at the conflicting evidence and conclude whether there's a serious question raised? They do that because there are still teeth, even if you believe the Warner standard is lower, and we think the district court correctly applied that standard. Can you address the Xenomax issue? Because you raised that and you have not yet addressed that. Yes, I would love to address that issue, Your Honor. This is another issue of a factual finding that the district court made that we think is correct. So the FTC argued Microsoft has withheld Xenomax games in the past, therefore they're going to withhold Call of Duty in the future. What we presented in the record, and this goes to the point that the judge... We don't agree that it's improper to rely on statements of intent, but it's not the only thing the judge relied on. There's eight separate reasons, plus the Sony contract, why she found no incentive. And one of those reasons is that the Xenomax games are qualitatively and fundamentally different from Call of Duty, and I believe that all of the following points are uncontested. Xenomax games are single-player games. Xenomax games are not played between users across platforms. Xenomax games do not owe their economic success to being played between users on different platforms. And after the acquisition of Xenomax, the first two games that came out were Sony exclusives that Microsoft shipped on the Xenomax platform. What the court found appropriate as a comparison was Minecraft. Counsel said there are special features to Minecraft. That's what makes it the right comparison. Minecraft is a game that's available on multiple platforms. It is a game that success is due to people on Sony, Nintendo, and Xbox all being able to play together. And what does the evidence show? Microsoft has expanded access to that game since buying it. Was there a difference between the behavior of Microsoft after the Xenomax merger versus what it had represented before? I don't believe so, Your Honor. I think that the first two games that shipped post-transaction were made exclusive to the Sony platform. I think decisions are made on a game-by-game basis, and two games have shipped exclusive to Xbox. I'm not sure that will continue to be the case, and then there's a lot of games in the future where I don't know that decisions have been made yet. I do want to know what your best case is for the proposition that it was legally permissive for the district court to consider statements of subjective intent. I think the Change Healthcare decision, the recent vertical merger case that was litigated in the D.C. Circuit, is instructive on this point, where the court did rely on that evidence. Your Honor, I see that my time has expired. You can answer the question. There's actually one other point in response to the Judge Forrest question earlier, and that's the point about whether it's enough for the FTC to just show that it's profitable to foreclose. First of all, that's not enough. There's no presumption in the vertical context that applies. There are presumptions in other merger contexts, but there isn't here. But I would just point the court to the actual record evidence. They did not show that it was profitable. They had an expert come in and try to present a model that said that it would be profitable to withhold the game. On cross-examination, and this is all in the record, the expert could not defend the critical variable that went into that model. In merger cases, you typically don't see an expert unable to defend his own assumptions. The other side may contest those assumptions, but doctorally couldn't explain where he came up with the key mechanics that made his model show profit. On which market are we talking about? This was in the console market. They didn't even try to show profitability and subscription in cloud. So in the one market where they presented a model, where they said it would be profitable, the expert couldn't defend the critical input that showed that it was allegedly profitable. And then our expert made a series of criticisms of that model that doctorally did not respond to in any of his trial testimony. And I would just urge the court to consider how anomalous that is in underscoring how weak the FTC's case was. If you look at Cisco, if you look at Whole Foods, if you look at AT&T, if you look at Change, the experts go at each other. When one expert raises an issue, the other expert responds, and the courts rely on that in making their findings at the end. But here you had an alleged model that showed profitability, and you had in response a bunch of critiques that weren't addressed, plus the fact that the judge found, which is correct, and I think due deference, that it would not make economic sense to take Call of Duty exclusive because of the economics of the game, which is exactly what Microsoft did not do with Zenimax as well, with Minecraft as well. Okay. I have one more question. Go ahead. So I'm trying to get my head around this ability incentive standard, and what's the meat behind that standard, right? And I don't see Microsoft objecting that that's a valid standard to consider. Am I correct about that? As long as it's ability and incentive and harm to competition, which is what the district court said, we don't object to that framework. Okay. So then, I mean, the problem for me, I mean, I'm a lawyer, not an economist, so I'm just trying to figure out, like, where's the legal statement? We don't really have fleshed out what does incentive mean, right? I'm not aware of court decisions that interpret what is incentive in this context and this is what you're looking for. So it seems to me we're dealing with rhetoric, right? Like, one side wants to say it's an absolutist thing. Like, we could just look at just sort of realities of markets and money and people's incentive to want to make money, and that's incentive without facts. And your side is you've got to prove facts. You've got to prove for this particular circumstance how this situation, how this business, how this market is going to behave, and how people are actually going to make decisions. And in weighing those, I'm sort of left with what tells me who's right? Because I don't have a case that tells me what incentive is and what it means and what I'm supposed to look for. We're supposed to just sort of develop that as the court? I'm looking for guidance there on what meat do I give to that standard that I'm not quite sure what it is because we haven't really construed it or applied it in a binding way with binding interpretation. Sure. I think I would say a couple of things, Your Honor. First, I think you can look to the AT&T case, and you can look to the change health care case. Those are vertical cases that claim this foreclosure, and I think this is the basic framework that's applied. Are you going to take an input away from your rivals? Even Brown-Hsu talks about that at 328. It says in a vertical merger you have to look at the share of the market that is foreclosed to your rivals as a result. So then is the right way to think about this, because I'm not an antitrust expert, is the right way to think about this is that we have this very generic statement in the Clayton Act about what the bad thing is, and then we've got these various standards that get used in cases or that get advanced by the government and theories, and all of that is supposed to sort of be advancing that generic statement in the Clayton Act, and it's all fair game so long as it advances that sort of generic wrong act. I suppose, Your Honor, but I think maybe the best way to think about incentive is that what you need to show to prove incentive I don't really think was a materially disputed point between the parties below, because the FTC tried to present economic evidence of incentive in the form of their model. They tried to prove factual evidence of incentive with the ZeniMax example, and then they tried to prove motive for an incentive to foreclose  And I think if you look at what the judge found, they are all things that go to incentive starting at page 34 of the record. Microsoft had taken every action after the merger was announced to expand access to the game, not consistent with an intent to foreclose. Microsoft had modeled that the game would continue to be available on other platforms. The rationale for the transaction wasn't about withholding. And you're talking about the console market now. I am, on all of those markets. But in the streaming services market, it seems to me that the district court had a different set of findings, or at least assumptions, that there was both ability and incentive to foreclose access to Activision games from streaming services competitors. And then what I understand to be, then they would also have to show harmed competition from that presumed foreclosure. I assume the district court was saying, I find enough evidence of ability and incentive to foreclose. And then they're saying the error was to assume that the benefit to GameSoft's customers was enough to counter the idea that there would be harm to competition. So can you address that? Sure. I think the court in the subscription and cloud market is best understood as resolving issues in our favor under the harm to competition prong, not really ability and incentive. I think, look at BrownShu. I don't think they presented a kind of freestanding BrownShu theory or that that even exists. BrownShu says you still have to show that your specific merger is anti-competitive. But if you look, and I believe it's page 328 of the opinion, what BrownShu says you need to show, actually, let me get you a specific citation on that. 332, I believe. It's both 328 and 332. You need to show that the merger will foreclose some share of the market from competitors. Even their case says that that's the evidentiary test. And I think the way the judge looked at that is to say, well, what is going to be available to competitors if the merger doesn't go through? Nothing. What is going to be available in the market to consumers if the merger does go through? The problem with that is that I think what the, arguably, would be without the merger, none of the streaming services would have access to Activision. With the merger, only one of them would have access to it, and the biggest one would have access to Activision games. And so the post-merger world is one in which one streaming service has access and the rest don't. And that seems to me, you know, as a matter of logic, that would have a negative effect on GameSoft's streaming service competitors, and that the mere fact that customers, right, some gamers, essentially, would have increased access to Activision games does not counter the idea that there's a competitive harm to GameSoft's competitors. So what is, if that's correct, that that was legal error to equate the benefit to the customers to the benefit to competition, what is your response to that? Let me try to answer that more directly. No case holds that just withholding an input from a rival isn't in and of itself a harm to competition, because competition is dynamic. There are so many things those rivals could do to become competitive in that space in response, and you would have to assess what does the market look like after they do that. So just to give some examples, Sony could actually decide to put its games on a subscription service, which it doesn't do today. It could decide to put them on in any form. It could decide to put them on so-called day and date, which is what Microsoft does, which means you put it out the day it's released. Sony could do that, and we could see what the market would look like given their substantial lead in the console and their substantial lead in installed base. Others could decide this is a market that we really want to compete in and enter it, Nintendo, Amazon, others. That would be the type of evidence that the FTC would need to show if they wanted to actually show that there was harm to competition, not just that we have something, but that us having something and not giving it to other people, which by the way isn't going to happen, but evidence that us having this and not giving it to other people puts them in a worse place competitively. And there was no evidence in the record of that actually occurring. If I understand correctly, it would be that they needed to show more evidence that this would essentially exclusive access on GameSoft to Activision games, that that would essentially be something that the other competitors could not compete with, and that data is not there. Exactly. And if you look at this industry, I would just add, Your Honor, it is very competitive, and exclusives are the name of the game. So it is like not an uncommon thing for a competitor to have input that others don't. The market leader, Sony, has eight times as many exclusives as Microsoft does. Can I ask one small question about who's the leader in the subscription market? Because I thought your brief said that Sony was, but it seemed to me that that was including this lowest level that's just used for multiplayer and not the real, the higher tiers of the subscription market where Microsoft seems to be well ahead. Am I reading that correctly? I think that's right, Your Honor, but I would just say two things. One, there wasn't a factual finding that one of those is the right way to look at it, Your Honor. No, but you made a representation about that in your brief, so I was trying to understand it, and that's how I analyzed it. And I want to know if that was correct. I think if you look tier for tier, it may be that we're ahead in some of the tiers, and they don't actually match up perfectly. Because most people are not in the lowest tier. I mean, overwhelmingly, they're in the higher tiers. And there, you are ahead. I believe that's right, but I think that does just go then to the answer to Judge Sung's question, which is that's also a huge group of people that Sony could tap into if they chose a different business model, which is something that happens when you have a competitive impact. You respond competitively. They haven't put their games and made the higher levels more attractive because they don't see a reason to do so right now with their lead-in exclusives. So that's where competition could evolve, and that's what the FTC would have to prove. All right. Thank you, counsel. And we'll hear now rebuttal. Thank you, Your Honor. There are a few things I'd like to address, but let me first, just so we don't forget, lay out the big picture. We have here three separate markets, counsel, subscription, and cloud. We have two theories of liability. The ability and incentive to foreclose is one. Brown shoe is another. For the district court's decision to stand, the district court has to be right on all six of these combinations because contrary to what my friend said, we specifically in the very first memo we submitted to the court, in the TRO memo, that's at 3 ER 541 to 542, we explained to the court that there are two ways that the FTC can show likelihood of success. One is ability and incentive. One is analyzing the factors that Brown shoes spoke about and that either one of those two would be enough. On the ability incentive, do you agree that harm to competition is an element of that? Absolutely, Your Honor. We were not denying that at all. And in fact, we did show that. And the harm to competition that comes after, Judge Forrest, after you show ability and incentive, I apologize if I misunderstood your question, that there's nothing else to show. There's nothing else to show in terms of you've satisfied that this company has the ability and foreclosing would be profitable. Then there is, in fact, you have to show, okay, that's foreclosing harm competition. And in fact, we did, we showed that because in at least the subscription and the cloud market, Microsoft market position is as the leader. Let me ask you about the cloud market because your opposing counsel said that the relevant rights in the U.S. have been divested. So his point is that if they're divested, then it can't be a harm to competition here. I'm glad you brought that up, Your Honor, because just to correct something, we did not say that the deal that Microsoft cut with CMA will not affect the U.S. market. I said it will not affect this case because the contract that the CMA then relied on, in fact, was not before the district court at all. That happened after the decision of the district court. What I did say is we do not know what effect it will have on the U.S. market because we have not done the analysis yet. We are, in fact, seeking discovery in the administrative. So you're saying that in reviewing this preliminary injunction, we have to close our eyes to the developments that have occurred in the U.K. and the fairly significant effect that that has on the cloud? We don't know what that effect is. We do not know what that effect is. I mean, the decision that's on review is what the district court found, and what the CMA found on the facts that were before the district court, the CMA found that the merger would be unlawful under U.K. law as well. But the point is that the Activision content has been divested for the U.S. cloud market. It is not that simple, Your Honor. It's not divested. You said there were contracts that would still allow you to do that. Yeah, exactly. All I can say is whenever you're talking about conduct remedy as opposed to true divestiture, divestiture would be to just spin off Activision altogether. But whenever you're talking about conduct remedies, they're much more complicated to analyze and even more complicated to enforce. So all I can say about that contract is we simply do not know. We don't know what effect it will have on the U.S. market. We don't know whether it would be enforceable in the U.S. We don't know whether it would be enough to undo the harm in the U.S. market as opposed to the U.K. market that the CMA concluded it would be enough. On the brown shoe and the trend towards concentration, Your Honor, there was, in fact, perhaps this example probably tells you everything you need to know about the whole case. Google, probably the biggest company in the world with unlimited resources, attempted to enter the cloud market. But to enter any of those markets, you need to capture enough content, enough games to, in fact, attract people to your platform. Google, after attempting to do that, decided that, in fact, it could not. It simply was not viable for Google to enter the cloud market because it could not get enough content. When did it do that? In January of 2023. And we have testimony from Google executives that the decision was based on, first, the industry was consolidating. That's the trend towards consolidation, driving the cost of maintaining the platform and getting content, driving them up. And in terms of the barriers to entry, which is another of brown shoe's factors, Google testified that, in fact, to bring AAA games, which are the most attractive games to gamers, it turned out to be too expensive even for Google to do it. And so when we're talking about the harm to competition, once you've established the ability and incentive, Microsoft in the cloud, in particular, is the dominant player. No one comes even close. It is the leader in the subscription market, as your honor pointed out, caught on. In fact, it has almost three times as many paying subscribers as the next rival. But in the cloud market, no one comes close to Microsoft. What is your response to counsel's contention that you rely just on a foreclosure theory and not on, you know, incipient monopoly theory below?  The two theories that we proposed, and again, I just pointed you to where from the beginning we've done that, is incentive and ability to foreclose and brown shoe. Brown shoe looks at the market in general, looks at what is the condition of this market. Is it consolidating? Are we getting towards an oligopoly? And if we are moving towards an oligopoly, then we are much more reluctant to approve mergers because that is the harm to competition. So on the brown shoe market, we submitted evidence again that the market was consolidating, that the barriers to entry are quite high in terms of the share of the market foreclosed, as just caught on that in the cloud market and in the subscription market, that share of the market is 100 percent. Once Microsoft buys Activision and forecloses it, nobody else in the market can get that content. But that's not the only kind of harm that Microsoft can cause. It can also cause harm through something we refer to in the economics literature as partial foreclosure. That's when you simply you don't foreclose your rivals, but you just disadvantage them. You give them the games later than your platform. You give them a lower quality game than you would have. And we've submitted testimony and argument. District Court made a finding that, as I construe the order, that it was that Microsoft did not have an incentive to produce shoddy quality games for other platforms that would antagonize the gamer community. I understand there was a disputed fact, but she resolved it, and that's how she resolved it, as I read it. But it was also, Your Honor, it was based on a legal error, because it was based on the wrong economic theory. The District Court said, if Microsoft does not have the incentives for full disclosure, it will not have the incentive for partial disclosure. And I found that it did not have incentive for full disclosure, so therefore it does not have incentive for partial foreclosure. That is economically incorrect. Often, partial foreclosure... No, I understand the abstract, but she didn't, that isn't, I mean, the rationale went beyond that point. As I'm reading the order, I mean, she looked at whether or not they would have an incentive to have lower quality games on the other platforms, and she made a finding that that would produce a loss of goodwill in the gaming community, that would be a disincentive to do that, and that it was not likely to happen. But if that was... That's not based on some, you know, generic proposition that partial always is equal to total, or vice versa. Well, we take the District Court at its own word, Your Honor. That was, at the very start of its analysis of partial foreclosure, it made that erroneous statement, that if you don't have incentive for full disclosure, you don't have it for partial foreclosure. But also... But she specifically addressed the issue of partial disclosure in the form of degraded games, and didn't rely on the general proposition and made a specific finding. But it didn't say what is it that it relied on, when in fact we submitted evidence that Microsoft both, in fact, does partial foreclosure on Minecraft, for example. That one of the games that it acquired 10 years ago, Minecraft, on one of its rival platforms, is not native to that platform, which means many of the features of the game are not available on that platform. So, in terms of history, Microsoft has done that. Microsoft also itself, in fact, guards against specifically that, about it being disadvantaged by inserting clauses in its contracts to make sure it will not get games that are less quality or later than others. I'm looking at page 45 of the order where she discusses partial foreclosure and says the FTC has no expert testimony to support a finding that the combined firm would have the incentive to engage in such conduct, such conduct referring to releasing it at a later time on other platforms or having inferior versions. And then she criticizes Professor Lee's testimony on that point. And so it seems to be a finding there that we would review for clear error and that doesn't appear to be tainted by this idea that if you don't have incentive for full, you don't have incentive for partial. I think it is, Your Honor, because first of all, we did submit evidence, both economic evidence and testimony, about partial foreclosure. Where the legal error happened is the district court took its view, which we think is wrong, its view of Dr. Lee's testimony about total foreclosure and imported it into the partial foreclosure. But like I said, history shows that Microsoft both itself practices partial foreclosure and itself guards against partial foreclosure. And as our amicus brief from the antitrust professors show, the incentives can be very different and it can be quite profitable for companies to engage in partial foreclosure when they don't have the incentive for full disclosure. In fact, the Supreme Court's DuPont case is a prime example of that, where the Supreme Court found a violation even though DuPont did not have the incentive for full. I agree with you that it would be legally wrong to say that if you don't have an incentive to engage in full foreclosure, that you don't have an incentive to engage in partial, that you still might do partial. But it seems to me that she weighed that as a specific evidentiary issue She points out, Mr. Kotick testified, he was unaware of a developer intentionally developing a subpar game for one platform versus another. Such conduct would obviously draw vitriol from gamers that would be well-deserved, would cause reputational damage to the company. Consistent with that testimony, the record does not include any evidence  This is a factual finding that seems to me to be separate from this legal error. Fair enough. But that is also a factual finding, undisputed evidence. Because I can point you right here to the evidence that the FTC put in where partial foreclosure is in fact profitable, and it is possible, and it was practiced by Microsoft. So, if to the extent that the district court made a factual finding that is separate from its wrong legal statement, then that itself is also wrong under the Warner Communications standard. Because if in fact there is disputed evidence on a key fact, the district court is not supposed to make a finding. So where in Warner do you see that proposition adopted? Can you tell me specifically where in the opinion that emerges? Yes. That is at 742 F2nd 1164. 1164? Yes. Where the court says it should not resolve the conflicts in the evidence. And again, as I mentioned before, as an analogy, if you think about it as an opposing summary judgment, if in fact there is a genuine issue as to a key fact, then 13B, as opposed to the merit cases, under 13B standard, the district court is not supposed to make findings on disputed evidence. If there is disputed evidence, it's enough to grant relief. So would you essentially say it's as long as there is a genuine dispute of material fact under Warner and the statutory standard here, the PI should issue? Yes. And it makes perfect sense, Your Honor, because the merit standard, the Clayton Act Section 7 standard, talks about a merger may substantially lessen competition. And then the 13B standard, you're talking about not even showing a likelihood of success. In fact, just considering the likelihood of success that the FTC shows relief is in the public interest. So the likelihood of a likelihood. And just to, I mean, since we're analogizing to the summary judgment, there are some situations in which there's some evidence on one side, some on the other, but it's so overwhelming and favoring one side that the court would say there's not really a genuine dispute. You acknowledge that's a possibility, but you're just saying this is not that case? Correct. Okay. Only if there is a genuine dispute. Okay. Well, I mean, I see the paragraph you're referring to. It says, because the issue in this action for preliminary relief is a narrow one, we do not resolve conflicts in the evidence, compare concentration ratios and effects on competition in other cases or undertake an extensive analysis of the antitrust issues. We hold only that the commission has met its burden of showing a likelihood of success on the merits. It seems to me to be very different from saying that fact finding is illegal. No, no, no. I did not say that at all. Your honor. You said if there's a disputed issue, it can't be resolved. I'm saying if there is, again, just as an analogy and only on this narrow point, because I don't want to stress the analogy too much. If you look at, in fact, what this court did in Warner communications, if you go through the analysis that it itself did after concluding that the why it, it thought that a PI should issue, it goes through the evidence that the, that the FTC had put in. It is not discounting that there was evidence on the other side, but so long as on key facts, there is in fact to put it in, to put it in summary judgment terms, if a jury could find one way or the other on that, on that evidence, the district court should not make findings. It should issue the PI. It should allow the FTC to, in fact, proceed to develop its case and do the merits, the merits proceeding. I mean, I understand the, you know, the ultimate standard here is raising serious, substantial, difficult questions, but the district court is permitted in determining whether to, it's going to exercise its equitable power to prevent something from happening and joining private parties and putting the power of the court on them to make subsidiary factual findings within the context of that lower, more lenient standard, but it gets to make factual findings with respect to whether that standard has been met. We're not denying that you're on. What we're saying is there are some, some key issues on which the district court made findings and then relied on those findings to deny relief. And one, one clear example is, is Minecraft a better evidence of Microsoft past contact with, with, with regard to foreclosure or is the Xenomax a better conduct? Now we, the FTC thinks it's not a close case. Xenomax is a more recent case, much bigger case. The portfolio is a much closer to, to Activision than Minecraft. If I can try to boil down, if I understand you, you're saying there can be serious questions as to the factual disputes and you think you, there are serious questions as to the factual disputes, but instead of the district court thing, there's a serious question as to this factual dispute. The district court said, I resolved this factual dispute and now I find no serious question as to the ultimate question of law. Absolutely. Okay. Absolutely. And you think that was error under Warner? That is absolutely. It is in fact more so because if the actual language of Warner of what the standard for likelihood of success is, it assumes that in fact, the FTC's case had not yet fully been fully developed. Those serious questions, it is serious questions to allow the FTC, if I can find the language here, to allow the FTC to, to make them foreground for thorough investigation so that the investigation is not fully done for study, for deliberation. There's a fair amount of time on this case and a lot of documents. This was not a rush, you know, action on the part of the FTC. No, Your Honor, but bear in mind what the district court relied on. Mostly our contracts that were entered into after the complaint was filed. So while we had a lot of, a lot of time to investigate, the facts were changing all along. Even after the district court decided the case, Microsoft went ahead and entered into yet another contract. And so the, the point is the bottom line from all this is, has the FTC actually, if you look at the merger in general, are there really any issues to be resolved about this merger? Or do we just wave it through? It's totally fine. If there are any issues, then the law says it should go to the FTC. It should be allowed. The FTC should be allowed to actually carry out its congressional mandate. And that's what we think the district court did not allow us to do. All right. Thank you counsel. Thank you very much. I appreciate the very helpful arguments. All the counsel in these cases and the case just argued will be submitted and we will be in recess for 10 minutes.
judges: COLLINS, FORREST, SUNG